UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARWIN MOORE,

                Plaintiff,

vs.

UNITED PARCEL SERVICE, INC., et al.,

                Defendants.

_____/

Civil Case No.
09-CV-14896

HON. MARK A. GOLDSMITH

## OPINION AND ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS

### I. INTRODUCTION

This is a so-called "hybrid § 301" case brought under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The case is brought by Plaintiff Darwin Moore against his former employer, United Parcel Service, Inc. ("UPS"), alleging breach of the collective bargaining agreement ("CBA"), and against his former union, the International Brotherhood of Teamsters Local 243 ("Local 243" or "the union"), alleging breach of its duty of fair representation. Plaintiff claims that the union – through its business agent, Gregory Lowran – mishandled his wrongful termination grievance against UPS based on intra-union political animosity between Lowran and Plaintiff.

Now before the Court are UPS's motion to dismiss or, in the alternative, for summary judgment,[1] and the union's motion for summary judgment. The motions are fully briefed, and oral argument was heard on July 26, 2012. Following oral argument, the Court requested and

_____

[1] The Court has previously concluded that Plaintiff has stated a hybrid § 301 claim on which relief can be granted. See Dkt. 49. Therefore, UPS's request for dismissal under Rule 12(b)(6) is summarily denied.

received supplemental briefs from the parties. The Court has thoroughly reviewed this matter, including the pleadings, the voluminous written submissions, and the evidence attached thereto. For the reasons that follow, the Court will grant summary judgment in favor of Defendants.

## II. BACKGROUND[2]

Plaintiff has been employed at UPS since 1984. At all times relevant to this litigation, Plaintiff worked as a package car driver at UPS's Pontiac, Michigan, facility. The terms of Plaintiff's employment were governed by a CBA to which Plaintiff's union and UPS were parties. At all relevant times, the union was Plaintiff's exclusive bargaining representative. Gregory Lowran served as the secretary-treasurer and full-time business agent of the union. Chuck Schmidbauer served as UPS's Michigan labor relations manager and is the individual who made the ultimate decision to terminate Plaintiff's employment with UPS. James Cianciolo was the president of the union.

On June 1, 2009, Plaintiff was terminated from his position with UPS for being "grossly insubordinate and fail[ing] to follow management's instructions on numerous occasions" pursuant to Article 17(i) of the CBA.[3] See June 1, 2009 Termination Letter (Dkt. 69-5). More

---

[2] The background is gleaned from the evidence attached to the parties' motion papers and from the parties' respective statements of material facts not in dispute. In lieu of setting forth all pertinent facts in this initial background section, the Court discusses key (and mostly undisputed) background facts here and notes additional facts as they become relevant to the legal issues discussed. The Court dispenses with record citations for factual propositions that are undisputed.

[3] Article 17(i) of the CBA provides, in pertinent part:

> The Employer shall not discharge nor suspend any employee without just cause. No employee shall be suspended or discharged without first being given (1) warning letter of a complaint and also be given a local level hearing except for the following offenses
>
> * * *
>
> (i) other serious offenses, the Company and the Union agree that there are offenses where any employee may be suspended in lieu of discharge.

specifically, Plaintiff was found to have repeatedly violated certain UPS "delivery methods," which are specific guidelines governing package handling, pick-up, and delivery that UPS package delivery car drivers like Plaintiff are required to follow.  In addition, Plaintiff was accused by management of purposely and continually disregarding management's instructions, instead doing just the opposite of what management directed and re-directed him to do.

The circumstances immediately precipitating Plaintiff's termination on June 1 are as follows.  On April 29, 2009, Pontiac Center Manager Paul Maconochie and UPS Supervisor Kenneth Romps observed Plaintiff as he picked up and delivered packages.  The following day, Romps drove Plaintiff's route and made changes to Plaintiff's "Delivery Order Listing" (the number and order of stops on Plaintiff's route).  On May 5, 18, and 29, 2009, UPS management subjected Plaintiff to so-called "lock-in rides," a practice where UPS management accompanies a driver on his/her route to establish a driver's demonstrated level of performance.  Romps accompanied Plaintiff in his truck on all three lock-in rides.

Romps' notes from the first lock-in ride on May 5 reflect that Plaintiff repeatedly violated numerous UPS methods, and that the violations continued even after Plaintiff was apprised of the violation by Romps.  See Romps' Notes from May 5, 2009 Lock-In Ride (Dkt. 69-27).[4]  Romps'

_____

CBA at 217 (Dkt.  69-4).  Schmidbauer testified that the phrase "other serious offenses" in Article 17(i) includes, in his experience with UPS, "failure to follow instructions [and] gross insubordination."  Schmidbauer Dep. at 103-04.  Plaintiff also testified that an employee's failure to follow management's instructions could warrant termination under Article 17(i).  Pl. Dep. at 80.

[4] Some of the methods violations noted by Romps are: traveling below the posted speed limit, extra handling of packages, extra select time, failure to record while walking, not walking fast enough, inability to remember the next stop with one look, failing to call out "UPS" at each stop, engaging in excessive/inappropriate discussions with customers, and failure to park truck so as to have a short/direct path to the delivery point.  In his notes, Romps notes areas in which Plaintiff improved throughout the day but, more frequently, describes specific instances of repeated violations.

notes from the second lock-in ride, occurring on May 18, reflect more of the same – numerous methods violations despite warnings.[5]   See Romps' Notes from May 18, 2009 Lock-In Ride (Dkt. 69-28).

The third and final lock-in ride occurred on May 29, 2009.  Before the ride commenced, Romps and other management officials met with Plaintiff.  Romps recounted the meeting as follows:

> [T]his meeting was to establish very clear expectations for the ride. . . . This time a written document was given to Darwin explaining exactly what was expected of him during the ride regarding following UPS's established methods and my [Romps'] instructions.  I read the document word for word and explained each point.  The meeting ended with clear agreement from all parties that I would no longer be expected to instruct Darwin over and over and over again on very basic methods, and that I would no longer tolerate his refusal to comply, either by word or by action.  It was also made clear that not following the instructions given in the meeting or on road would have very serious ramifications.

Romps' Notes from May 29, 2009 Lock-In Ride (Dkt. 69-29).  Plaintiff's testimony about the meeting is not inconsistent with Romps' version.  See Pl. Dep. at 110.

The May 29 lock-in ride was similar to the previous two.  Romps reported that Plaintiff made many of the same mistakes as he had made previously, including failing to call out "UPS," failing to record on the walk to the delivery point, and failure to park at an appropriate spot so as to have a short/direct path to the delivery point.  Plaintiff continued making these mistakes even after Romps reminded Plaintiff of the morning meeting in which Romps advised Plaintiff of the possibility for serious ramifications in the event of continued methods violations.

---

[5] By way of example, Romps had to instruct Plaintiff to call out "UPS" – as he had numerous times during the previous lock-in ride on May 5 – during the first two stops on May 18.  On the next twelve stops, with the exception of one, Plaintiff was compliant, calling out "UPS" at each stop.  But then Plaintiff drifted back to his old ways, failing to call out UPS on seven of the next ten stops.  When Romps reminded him, Plaintiff responded "I'm trying boss."

At some point during the May 29 lock-in ride, Romps called Maconochie, reporting Plaintiff's continued violations.  Maconochie advised Romps to stop the ride, and take Plaintiff out of service.  Maconochie contacted Schmidbauer, whose responsibilities include consulting on discipline issues.  Schmidbauer concluded, based on information received from Romps, that Plaintiff was "making a mockery" of the lock-in ride by repeatedly failing or refusing to adhere to methods that he was previously instructed to follow.  As a result, Schmidbauer terminated Plaintiff for gross insubordination and failure to follow management's instructions under Article 17(i) of the CBA.

When asked during his deposition why Plaintiff was terminated, Schmidbauer testified more specifically about the reasons for Plaintiff's termination:

> Q:   Why was Mr. Moore fired?
>
>                        * * * *
>
> A:   For his actions that had previously occurred during . . . multiple rides, but ultimately for his action on 5/29 where the company – I determined that he was grossly insubordinate and failed to follow management's instructions on numerous occasions.
>
> Q:   Was there a straw that broke the camel's back with respect to your decision to discharge Mr. Moore?
>
> A:   It was the events, the multiple infractions that occurred on 5/29 is what brought me to my decision to terminate.

Schmidbauer Dep. at 17-18.  Schmidbauer described Plaintiff's insubordination as follows:

> A:   His continued vacillation of not following the driver methods and working as directed as Mr. Romps had  instructed him to work during the course of that morning [referring to the morning of May 29, 2009, and "the previous days' rides, as well."].

Id. at 20-21.  When pressed on what specific UPS methods Plaintiff had failed to follow, Schmidbauer testified:

> A:   Numerous methods.  Getting up to speed, calling out UPS, taking the most
> direct walk path, parking in the best location, those types of methods
> which would increase his day.

Id. at 21.  Notes written by UPS management, including Romps and Maconochie, detailing Plaintiff's alleged methods violations reflect both that Plaintiff was alleged to have violated various UPS methods on a frequent basis in April and May 2009, and that the violations continued even after they were brought to Plaintiff's attention by management.  See Romps/Karst Notes to File (Dkt. 69-13); Maconochie Notes (Dkt. 69-14).

In his declaration filed in connection with this litigation, Plaintiff takes the position that he committed no methods infractions during the lock-in rides occurring on May 5, 18, and 29.  Pl. Decl. ¶¶ 72-73, 79-83, 101-111.  Plaintiff states that he performed his job during all three lock-in rides as he always had in the past and, specifically, as he had during past rides during which he was observed by management and given only positive feedback.  Id. ¶¶ 45-61.  According to Plaintiff, the only time he committed methods violations on May 5, 18, and 29 is when Romps instructed him to do so by directing Plaintiff to exceed the speed limit, id. at ¶¶ 72, 81, 101, and cut across lawns (Plaintiff states that cutting across lawns is inconsistent with his training and is a methods violation).  Id. at ¶¶ 42, 46, 74.  Plaintiff also states that nothing in UPS's methods rules required him to call out UPS at every stop, so long as he otherwise attracted customer attention, which he always did.  Id. at ¶¶ 33-34.

On June 4, 2009, Plaintiff filed a grievance challenging the termination.  Plaintiff was represented throughout the grievance proceedings by Lowran.[6]

---

[6] Generally, the grievance procedure under the CBA operates as follows.  An employee with a grievance first discusses it with his or her immediate supervisor and union steward.  If there is no resolution, the employee contacts his or her union steward and files a formal grievance, and the matter proceeds to a "local level" hearing, at which UPS and union officials may settle, sustain, deny, or "deadlock" the grievance.  If deadlocked, the matter proceeds to a monthly union/UPS

Lowran was, at all relevant times, a member of the union's incumbent faction, while Plaintiff had been a dissident since 2006, loyal to a faction opposing Lowran's incumbent faction. Plaintiff first ran for a delegacy in opposition to the faction supported by Lowran in 2006; in 2008, according to Plaintiff, things were "uglier" when Plaintiff ran against then-incumbent union president James Cianciolo. In September 2008, Cianciolo told Plaintiff that he (Cianciolo) would do "whatever [is] necessary" to ensure his re-election: "This is my job and my livelihood, I do my job well and I will do whatever necessary to get re-elected." Cianciolo Dep. at 52 (Dkt. 88-8). Cianciolo further testified that, as of September 2008 when he made this statement, he "didn't have any ill will toward" Plaintiff, considered Plaintiff a "friend," and "liked him personally." Id.

Prior to his termination on June 1, 2009, Plaintiff had a history of disciplinary problems during the latter years of his employment at UPS. In 2004, Plaintiff was discharged for allegedly destroying customer property. Lowran represented Plaintiff at the local level hearing. Plaintiff accepted a settlement that allowed him to continue working at UPS.

On June 1, 2007, Plaintiff was discharged for alleged dishonesty. Specifically, Plaintiff was accused of "padding" his mileage by taking longer routes than necessary. Represented by Lowran, the cause was heard at the local level, and then at the State Panel level in July 2007. Plaintiff won and his employment was reinstated with backpay.

---

"State Panel" hearing. The State Panel is composed of four to eight arbitrators, half chosen by the union and half chosen by UPS. The union-chosen arbitrators are referred to as "union-side" arbitrators. The State Panel can sustain, deny, or deadlock a grievance. If deadlocked, the grievance proceeds to a Joint Area Committee ("JAC") hearing. Decisions at any level of the grievance procedure are final and binding on the parties.

On December 24, 2007, Plaintiff was discharged for allegedly being off work for a medical problem without medical documentation. Again, Plaintiff was represented by Lowran, and the discharge was rescinded at the local level with an award of backpay.

In November 2008, Plaintiff was discharged for "no call, no show."[7]  Plaintiff was represented by Lowran, and the discharge was rescinded at the local level with an award of backpay. According to Plaintiff, his success in getting his November 2008 discharge rescinded was entirely due to his own efforts, and not at all due to the efforts of Lowran. Pl. Decl. ¶ 20 (Dkt. 109).

## III.  LEGAL STANDARD

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When evaluating a summary judgment motion,

> credibility judgments and weighing of the evidence are prohibited. Rather, the evidence should be viewed in the light most favorable to the non-moving party. Thus, the facts and any inferences that can be drawn from those facts must be viewed in the light most favorable to the non-moving party.

Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 373 (6th Cir. 2009) (citations, quotation marks and brackets omitted).

## IV.  ANALYSIS

### A.  Legal Framework

#### 1.  Hybrid § 301 Claims, Generally

"Section 301 contemplates suits by and against individual employees as well as between unions and employers," and "encompass[es] those seeking to vindicate 'uniquely personal' rights

---

[7] This means that Plaintiff allegedly did not provide documentation justifying his absence from work.

of employees such as wages, hours, overtime pay, and wrongful discharge." Hines v. Anchor Motor Freight, Inc., 424 U.S. 554, 562 (1976). As the exclusive bargaining agent in the negotiation and administration of a collective bargaining agreement, the union assumes the responsibility and duty of fair representation for all of its members. See Humphrey v. Moore, 375 U.S. 335, 342 (1964).

In hybrid § 301 actions, claims against the employer and claims against the union are combined into one into one hybrid suit. See Chapman v. United Auto Workers Local 1005, 670 F.3d 677, 682 (6th Cir. 2012) (en banc). As recently explained by the Sixth Circuit:

> The suit against the employer alleges a breach of the collective bargaining agreement under § 301 of the LMRA. The suit against the union alleges breach of the union's duty of fair representation, implied under the scheme of the National Labor Relations Act. The two claims, however, are inextricably interdependent: To prevail against either the company or the Union, the employee must not only show that his discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union. The employee must prove both claims to recover from either defendant.

Id. (citations, quotation marks, and brackets omitted). See also Driver v. United States Postal Serv., Inc., 328 F.3d 863, 868 (6th Cir. 2003) ("Because an employer's violation of the collective bargaining agreement is ordinarily only enforceable by the union, . . . the employee can prevail in either suit only by prevailing in both; the employee must show both that the employer violated the collective bargaining agreement and that the union breached its duty of fair representation.").

### 2. Breach of Duty of Fair Representation Component

To prevail on a breach of duty of fair representation claim, a plaintiff must show that "the union's actions or omissions during the grievance process were arbitrary, discriminatory, or in bad faith." Garrison v. Cassens Transp. Co., 334 F.3d 528, 538 (6th Cir. 2003). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness' as to be

9

irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67 (1991) (quoting Ford Motor Co. v. Huffman, 345 U.S. 330, 338 (1953)). See also Marquez v. Screen Actors Guild, 525 U.S. 33, 45-46 (1998) (A union has "room to make discretionary decisions . . . even if those judgments are ultimately wrong. . . . A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation.").

"A claim of discrimination as the basis of a breach of the duty of fair representation requires 'substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives.'" Baker v. Interstate Brands Corp., 801 F. Supp. 456, 464 (D. Kan. 1992) (quoting Amalgamated Ass'n of St., Electric Ry. & Motor Coach Emps. v. Lockridge, 403 U.S. 274, 301 (1971)). "For the union's actions to be discriminatory in violation of the duty of fair representation, they must be based on invidious distinctions such as race, gender, national origin, or citizenship; or they must exhibit hostility based on political differences, exercise of free speech, or personal animosities." Baker, 801 F. Supp. at 464 (citing cases).

"[T]o show bad faith, a plaintiff must show evidence of fraud, deceitful action, or dishonest conduct"; "mere negligence or poor judgment" is not enough. Summers v. Keebler Co., 133 F. App'x 249, 253 (6th Cir. 2009).

Although under these standards, "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion," Vaca v. Sipes, 386 U.S. 171, 191 (1967), "[u]nions are not . . . obligated to prosecute grievances that they find to be meritless." Kelsey v. FormTech Indus., 305 F. App'x 266, 269 (6th Cir. 2008). See also Driver, 328 F.3d at 869 ("The duty of fair representation does not require that a union fully pursue every grievance filed."). The Supreme Court has instructed that "[a]ny substantive examination of a union's performance . . . must be highly deferential, recognizing the wide latitude that negotiators need for the effective

10

performance of their bargaining responsibilities." O'Neill, 499 U.S. at 78. See also Garrison, 334 F.3d at 539 ("When reviewing a union representative's actions or omissions, we must never lose sight of the fact that union agents are not lawyers, and as a general proposition, cannot be held to the same standard as that of licensed professionals.").

Once the plaintiff proves that the union breached its duty of fair representation, the burden remains with the plaintiff to show prejudice; that is, the plaintiff must "prove that the Union's actions tainted the grievance procedure such that the outcome was more than likely affected by the Union's breach." Dushaw v. Roadway Exp., Inc., 66 F.3d 129, 132 (6th Cir. 1995). As stated by the Sixth Circuit:

> The impact of the breach on the outcome must . . . have been substantial; to establish a breach of fair representation, the plaintiff must meet the onerous burden of proving that the grievance process was seriously flawed by the union's breach of its duty to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct. Thus, if a union fails to present favorable evidence during the grievance process, this failure may constitute a breach of its duty only if that evidence probably would have brought about a different decision.

Black v. Ryder/P.I.E. Nationwide, Inc., 15 F.3d 573, 585 (6th Cir. 1994) (citations, quotations marks, and emphasis omitted).

### 3. Breach of CBA Component

In cases where the plaintiff's claim for breach of the CBA was submitted to, and resolved by, an arbitrator, the plaintiff "will generally be unable to succeed on a hybrid § 301 claim." Gilreath v. Clemens & Co., 212 F. App'x 451, 460 (6th Cir. 2007). Courts must "afford[] great deference to the arbitrator's determination, and that decision will be upheld so long as it 'draws its essence from the bargaining agreement.'" Id. (quoting Wood v. Int'l Bhd. of Teamsters, 807 F.2d 493, 500 (6th Cir. 1986)). The Sixth Circuit

11

has delineated only four circumstances in which the arbitrator's determination will not withstand review: (1) a decision expressly contradicting the terms of the collective bargaining agreement; (2) a decision reading additional terms and requirements into the agreement; (3) a determination unsupported by the agreement or irrationally flowing from it; and (4) a result founded in generalized notions of "fairness and equity," and not specifically in the agreement's terms.

Gilreath, 212 F. App'x at 460.

## B.  The Parties' Arguments

### 1.  Plaintiff's Theory of Liability

Plaintiff argues that there are fact issues precluding summary judgment in favor of UPS and the union on whether UPS breached the CBA and whether the union breached its duty of fair representation.  As to the former claim against UPS, Plaintiff contends that his termination violated the CBA because the specific CBA provision under which Plaintiff was terminated – Article 17(i) – requires an intent to disobey an order – an intent that Plaintiff maintains he did not possess.  Plaintiff argues that he should have been disciplined, if at all, under a different provision of the CBA – a provision governing unintentional conduct and calling for progressive discipline.  Plaintiff relies on Linton v. United Parcel Service, 933 F.2d 1008 (Table), 1991 WL 86277 (6th Cir. 1991) ("Linton I") in support of his argument.

With regard to his breach of duty of fair representation claim against the union, Plaintiff argues that the union mishandled his grievance against UPS out of political animosity between Plaintiff and Lowran – conduct that Plaintiff argues constitutes a breach of the union's duty of fair representation.  Specifically, Plaintiff alleges that Lowran had a personal political interest in eliminating Plaintiff, as Plaintiff was Lowran's political adversary in the intra-union political arena.  As a result of this political animosity, Plaintiff contends that Lowran essentially sabotaged Plaintiff's grievance proceedings by perfunctorily prosecuting the grievance and not

doing all he could do to win.   Specifically, Plaintiff argues that the following actions (or inactions) by Lowran support Plaintiff's breach of duty of fair representation claim:

- Lowran failed to adequately prepare for the local level grievance proceedings by going in "cold," "without union investigation, without exhibits, without arguments, and without having even seen Moore's grievance . . ."  Resp. at 10.  See also Pl. Decl. ¶ 123 (Dkt. 87) ("Lowran did not interview me or otherwise investigate the discharge before the Local Level hearing, and was thus unable to assess the merits of the case.").

- Lowran accepted as true, without adequate union investigation, that Plaintiff had committed offenses deserving of disciplinary action of some sort.  See Resp. at 9.

- Lowran failed to object when UPS offered evidence at the State Panel proceedings of Plaintiff's past methods violations.  Plaintiff contends that this evidence was extremely prejudicial and likely affected the outcome of the proceedings.  See Resp. at 9.

- Lowran failed to offer evidence at the State Panel proceedings – such as witness testimony and photographic evidence – that would have corroborated Plaintiff's version of events, thereby bolstering his case, which Plaintiff asserts boiled down to a credibility contest with UPS management.   In particular, Plaintiff heavily faults Lowran for not accompanying Plaintiff on his route, as he had done in connection with his representation of Plaintiff during past discharge proceedings, which Plaintiff asserts would have allowed Lowran to rebut each alleged methods infraction charged by UPS.   See generally Pl. Decl. ¶¶ 124-128.

- Lowran failed to advance meritorious arguments before the State Panel.  Namely, he failed to argue that Plaintiff should have been disciplined under a CBA provision calling for progressive discipline and not a provision calling for termination.  See Resp. at 10-11.

- Lowran failed to produce records that were accessible to him that would have shown that employees committing violations similar to those committed by Plaintiff were disciplined under a CBA rule calling for progressive discipline and not termination.  See Resp. at 9.

- Lowran continued serving as Plaintiff's union representative despite his political conflict of interest.  See Resp. at 11-13.

- Although the State Panel authorized Lowran to access UPS operation reports – reports that Plaintiff says would have provided support for his contention that UPS was holding him to higher standards than other employees – Lowran failed to obtain the reports.  In fact, according to Plaintiff, Lowran "modified or helped modify" the State Panel's favorable ruling "by surreptitiously removing [it] from the record of decision."  In his response brief, Plaintiff does not point to any evidence in support of these accusations.

In support of his argument that the above-described conduct constitutes a breach of the union's duty of fair representation, Plaintiff relies on Schoonover v. Consolidated Freightways Corporation of Delaware Local 24, 147 F.3d 492 (6th Cir. 1998), Linton v. United Parcel Service, 15 F.3d 1365 (6th Cir. 1994) ("Linton II"), and Williams v. Molpus, 171 F.3d 360 (6th Cir. 1999), overruled on other grounds, Chapman v. United Auto Workers Local 1005, 670 F.3d 677 (6th Cir. 2012) (en banc).[8]

---

[8] In his amended complaint, Plaintiff alleges that additional conduct by the union – beyond what is listed in the bullet points above – supports his claim that the union breached its duty of fair representation. Such additional conduct includes: (i) Lowran should have demanded, but did not, that the union-side State Panel members deadlock the grievance at the State Panel level; (ii) Lowran selected union-side State Panel members to sit on Plaintiff's panel who were politically hostile to Plaintiff and politically loyal to Lowran; and (iii) Lowran acted with political hostility when he withdrew an unfair labor practice charge filed with the NLRB. However, none of those additional arguments is discussed by Plaintiff in the analysis section of his brief in opposition to summary judgment. The Court, therefore, deems those additional arguments abandoned. See King v. Enter. Leasing Co. of Detroit, No. 03-71778, 2007 WL 1806208, at *5 (E.D. Mich. June 21, 2007) ("[C]laims asserted by Plaintiffs in their Complaint but not defended on summary judgment are deemed abandoned. The Court only addresses those claims for which Plaintiffs presented argument and analysis opposing summary judgment."); Equal Emp't Opportunity Comm'n v. Home Depot U.S.A., Inc., No. 07-0143, 2009 WL 395835, at *17 (N.D. Ohio Feb. 17, 2009) ("When a plaintiff asserts a claim in a complaint but then fails to delineate that claim in her brief in opposition to summary judgment, that claim is deemed abandoned.").

In any event, even if Plaintiff had argued these additional points, the Court would find them insufficient to support a breach of duty of fair representation claim against the union, even when considered in combination with the points that Plaintiff does argue. With regard to the first non-argued point, Defendants are correct that Lowran cannot demand that union-side arbitrators deadlock. See Thomas v. United Parcel Service, Inc., 890 F.2d 909, 923 (7th Cir. 1989) (union officials serving in capacity of arbitrators have duty to grievant to render fair and impartial decision on the merits of the grievance; they owe no "duty of partiality" to any person or entity). With regard to the second non-argued point, Defendants are correct that there is no evidence that Lowran even selected the two union-side members of the State Panel hearing Plaintiff's grievance. See Lowran Dep. at 42-43, 65 (testifying that he does not pick the union-side panel members when the grievant is a member of Local 243). With regard to the third non-argued point, Plaintiff has failed to present any evidence rebutting Defendants' argument that the union had no obligation to Plaintiff with regard to his unfair labor practice grievance.

14

## 2.  Defendants' Arguments in Support of Summary Judgment[9]

Defendants assert a number of arguments in support of their position that Plaintiff's hybrid § 301 claim fails.  With regard to Plaintiff's claim against UPS, Defendants argue that – contrary to Plaintiff's position – Plaintiff was <u>willfully</u> noncompliant (<u>i.e.</u>, insubordinate) with UPS's job guidelines.  According to Defendants, Plaintiff was specifically advised by UPS management of the things he was doing wrong, yet continued doing them.  Therefore, Defendants argue that Plaintiff's termination under the gross insubordination provision of the CBA – as opposed to the progressive discipline provision governing unintentional conduct – was appropriate.  Defendants also argue that, in any event, <u>willful</u> noncompliance is not necessary to justify termination under Article 17(i), the CBA provision under which Plaintiff was terminated; rather, noncompliance by itself (without a willfulness element) is sufficient to justify termination under Article 17(i).

With regard to Plaintiff's breach of the duty of fair representation claim against the union, Defendants first argue, as a threshold matter, that Plaintiff waived the claim because he failed to raise the issue of Lowran's bias/hostility during the State Panel proceedings.  Defendants rely mainly on <u>Early v. Eastern Transfer</u>, 699 F.2d 552 (1st Cir. 1983), <u>cert. denied</u> 464 U.S. 824 (1983), and <u>Bianchi v. Roadway Express, Inc.</u>, 441 F.3d 1278 (11th Cir. 2006), <u>cert. denied</u> 549 U.S. 954 (2006), in support of their waiver argument.

Defendants also argue that the union did not breach its duty of fair representation in representing Plaintiff because Lowran adequately represented Plaintiff throughout the entire grievance process.  Specifically, Defendants argue as follows:

---

[9] While both the union and UPS have filed separate dispositive motions, their arguments substantially overlap.  This is not surprising given that, under the applicable statutory framework outlined above, Plaintiff's hybrid § 301 claim asserted against both Defendants is entirely defeated if either of the two component claims is defeated.

- Lowran more than adequately represented Plaintiff at the local level hearing on June 4-5, 2009, as illustrated by the following: (i) Although Lowran – 99.9% of the time – goes into local level hearings "cold" (i.e., with no preparation), he did substantially more in Plaintiff's case by meeting with Plaintiff and other union officials in an attempt to prepare for the hearing; (ii) Lowran attempted as best he could to settle the grievance at the local level, (iii) Lowran requested – and received – a continuance of the hearing on June 4 so that he had adequate time to review documents; (iv) Lowran disputed UPS's case for discharge at the local level hearing; (v) Plaintiff never requested that he be represented by a different representative or filed a complaint against Lowran with the union's executive board; (vi) Plaintiff offers no evidence that the outcome at the local level (i.e., deadlock) would have been any different had Lowran done something differently.

- Lowran more than adequately represented Plaintiff at the proceedings before the State Panel on June 17, 2009, as illustrated by the following: (i) Lowran provided Plaintiff with a substantial amount of documents and information, as requested by Plaintiff; (ii) Lowran prepared for the proceedings by meeting with Plaintiff more than once, interviewing witnesses, and reviewing documents; (iii) on the morning of the hearing, Lowran met with Plaintiff and other union officials in preparation for the hearing; (iv) the State Panel hearing lasted 9-10 hours, which Plaintiff admits was one of the longest hearings he has ever seen; (v) Lowran met with Plaintiff over the lunch break to re-work the union's rebuttal case; (vi) Plaintiff had multiple opportunities to speak to the panel on his own behalf during the proceedings; (vii) contrary to Plaintiff's allegation otherwise, Lowran did argue at the State Panel proceeding that (a) Plaintiff was not insubordinate and should have been disciplined under a provision calling for progressive sanctions, and (b) UPS had an agenda against Plaintiff; and (viii) Plaintiff admitted to the panel that the union had presented all information on his behalf.

- Lowran's successful representation of Plaintiff in connection with his four previous grievances in 2007 and 2008 – which occurred after Plaintiff was, by his own admission, "openly and actively participat[ing]" in union politics, see Am. Comp. ¶ 47 – belies any suggestion that Lowran was acting out of political hostility in connection with his representation of Plaintiff during the present grievance proceedings.

- Even if there was a breach by the union of its duty of fair representation, there is no evidence of prejudice; that is, there is no evidence that things would have turned out differently if the union had done things differently.

Defendants rely mainly on Jones v. United Parcel Service, Inc., 461 F.3d 982 (8th Cir. 2006),

Dushaw v. Roadway Express, Inc., 66 F.3d 129 (6th Cir. 1995), and Grant v. Burlington

16

Industries, 832 F.2d 76 (7th Cir. 1987), in support of their argument that Lowran adequately represented Plaintiff. These cases, with the exception of Grant, are discussed below.[10]

## C. Discussion

To win this case, Defendants must succeed in defeating only one of the two component claims comprising Plaintiff's hybrid § 301 action. That is, Defendants must defeat Plaintiff's claim against UPS or its claim against the union, but not both. For the reasons that follow, the Court concludes that – even taking the facts in the light most favorable to Plaintiff – Plaintiff has not demonstrated a fact issue for trial with regard to his claim against the union for breach of its duty of fair representation. Therefore, the Court does not address Plaintiff's claim against UPS.[11]

As mentioned, the parties rely on a number of cases in support of their respective arguments on the merits of Plaintiff's breach of duty of fair representation claim. None of those cases is directly on point, but all of them are helpful guideposts shedding light on the factors courts consider in determining the viability of a breach of duty of fair representation claim against a union.

As noted, Plaintiff relies mainly on three cases in support of his argument that the union breached its duty of fair representation: Schoonover v. Consolidated Freightways Corporation of

---

[10] Grant is a Seventh Circuit case that was decided at a time when the Seventh Circuit employed a markedly different legal standard to breach of duty of fair representation claims than the one by which this Court is bound. In particular, the Seventh Circuit at the time did not consider arbitrary or perfunctory union conduct sufficient to establish a breach of the union's duty of fair representation. Because the Sixth Circuit does consider such conduct sufficient to establish a breach, Grant is unhelpful here.

[11] The Court also does not address Defendants' argument that Plaintiff waived his duty of fair representation claim against the union by failing to bring Lowran's political animus to the attention of the State Panel.

Delaware Local 24, 147 F.3d 492 (6th Cir. 1998), Linton v. United Parcel Service, 15 F.3d 1365 (6th Cir. 1994) ("Linton II"), and Williams v. Molpus, 171 F.3d 360 (6th Cir. 1999).

The plaintiff in Schoonover brought a hybrid § 301 case against his employer and union after being terminated for allegedly intentionally breaking off the brake pedal of his employer's truck out of dissatisfaction with his employer; the plaintiff maintained that the pedal was already broken when he boarded the truck. The plaintiff won at trial, and the employer/union appealed the district court's denial of their motion for judgment as a matter of law, which was made at the conclusion of all the evidence at trial.

The Sixth Circuit upheld the jury's verdict, finding that the employer/union failed to demonstrate that no one could reasonably find in the plaintiff's favor. At trial, the plaintiff presented the following evidence demonstrating that the union never took his grievance seriously: (i) the union failed to call an expert to rebut the employer's expert when the union knew that a rebuttal expert was crucial; (ii) the union failed to investigate other incidents involving broken pedals to demonstrate that the incident was not as unusual as it looked; (c) the union hastily credited the employer's version of the incident without doing any investigation; and (d) the union failed to bring a model of the truck to the grievance hearing, which could have allowed the panel to test the employer's version of the facts.

The plaintiff in Linton II was terminated for "dishonesty" in intentionally falsifying a job application by saying that he had never been convicted of a crime when, in fact, he had technically been convicted of a crime.[12] In Linton I, the district court granted summary

---

[12] The extremely unusual circumstances surrounding the conviction are such that it is very reasonable to assume that the plaintiff was genuinely unaware of the conviction. Without the assistance of an attorney, he plead guilty as a seventeen-year-old to "loitering," not knowing that the real name of the ordinance was "loitering where marijuana was kept," technically a "crime,"

judgment for the employer/union, concluding as a matter of law that the employer did not breach the CBA in terminating the plaintiff.[13]  The Sixth Circuit reversed, holding that the district court erred by equating a false answer with "dishonesty" because dishonesty includes a component of intent to deceive, and the district court did not undertake to determine the plaintiff's intent.

On remand, the district court granted summary judgment for the employer/union, this time concluding as a matter of law that the union did not breach its duty of fair representation. Represented by union representative Leon Cooper, the plaintiff argued at the local level grievance hearing that he made an honest mistake and did not knowingly falsify the job application.  After losing at that level, Cooper refused – despite the plaintiff's request – to press the grievance to the next level, stating that there was nothing else he could do.  The Sixth Circuit, in Linton II, reversed the district court's grant of summary judgment for the union on the plaintiff's breach of duty of fair representation claim, concluding that a reasonable jury could find that the union arbitrarily refused to press the grievance for essentially two reasons.  First, the record contained evidence that the union recognized the strength of the plaintiff's claim, yet refused to process it to the next stage solely because the union had a bleak history of winning falsification cases.  Second, the record contained evidence that the union had never before failed to process a grievance to the next level despite a request by the grievant that it do so.

In Williams, the third and final principal case on which Plaintiff relies, the Sixth Circuit reversed the district court's grant of summary judgment in favor of the employer/union, finding that the plaintiffs-employees had presented evidence from which a jury could find that the union

---

although the ordinance was declared unconstitutional a year later because it permitted conviction without evidence of criminal intent.

[13] The district court reasoned that, because the plaintiff provided a false answer on his job application, the termination for "dishonesty" was proper.

acted in bad faith or with discriminatory intent.  Williams involved the negotiation of a rider to a collective bargaining agreement between a parent company and its two subsidiaries.  The plaintiffs put forth evidence that: (1) seniority status was rarely "endtailed"[14] and the union offered contradictory reasons to support the legitimacy of endtailing; (2) the endtailing was proposed by the union itself, not demanded by the parent company; (3) the ratification of the agreement was likely based upon a misrepresentation by the union as to who had approved the agreement; (4) the union made a material misrepresentation to the plaintiffs about the party that demanded the endtail provision; (5) the agreement favored nine employees to the detriment of 200; and (6) one of the nine favored employees benefitted by the agreement was the union representative's son.

As noted above, Defendants rely mainly on three cases in support of their contention that Plaintiff's claim against the union is not viable: Jones v. United Parcel Service, Inc., 461 F.3d 982 (8th Cir. 2006), Dushaw v. Roadway Express, Inc., 66 F.3d 129 (6th Cir. 1995), and Grant v. Burlington Industries, 832 F.2d 76 (7th Cir. 1987).[15]

The two plaintiffs in Jones – after they were terminated and their grievances denied – asserted hybrid § 301 claims against their employer and union alleging, in relevant part, the union failed adequately to investigate, pursue, and otherwise process their grievances out of intra-union political animosity (both plaintiffs were outwardly politically hostile to union leadership).  As to the first plaintiff, the union, through its business agents: (i) testified during the grievance proceedings favorably on the plaintiff's behalf, and (ii) argued during the grievance

---

[14] Endtailing is when transferring employees are placed at the bottom of a terminal seniority list. In contrast, dovetailing is when two or more merged seniority lists recognize the original terminal seniority dates of each employee.

[15] Grant is unhelpful here for the reasons stated above.

proceedings that the plaintiff did not do anything wrong.  As to the second plaintiff, the union, through its business agents: (i) conducted several pre-hearing phone conversations with the plaintiff, (ii) held a thirty minute meeting with the plaintiff on the morning of the hearing, (iii) interviewed three other employees whose testimony the plaintiff thought would be helpful, (iv) researched a case that the plaintiff asserted might have precedential value, and (v) presented during the grievance proceedings the favorable statement of another employee.  Moreover, both plaintiffs were afforded an opportunity to testify on their own behalf and present argument at their respective grievance proceedings.  Both the district court and the appellate court concluded, as a matter of law, that the union's representation of the plaintiffs was adequate on these facts.

The plaintiff in Dushaw brought a hybrid § 301 claim against his employer and union after his grievance for wrongful termination was denied.  The plaintiff was represented throughout the grievance proceedings by a union representative – Richard Sanzo – who openly harbored intra-union political animus towards the plaintiff, as the plaintiff had run against – and beaten – Sanzo's hopeful in a union election.  The plaintiff alleged that the union breached its duty of representation by failing to call a witness who would have offered testimony corroborating the plaintiff's version of events, and by appointing a representative who harbored a grudge against the plaintiff.  The Sixth Circuit found, as a matter of law, no breach of the union's duty of fair representation, noting that the plaintiff was afforded an opportunity to present his own version of events before the grievance panel, and that the panel made its decision after hearing both sides of the story.  As for the plaintiff's argument that the union breached its duty of fair representation by not calling a favorable witness, the Sixth Circuit noted that the plaintiff had essentially waived that particular argument because, when asked at the grievance proceeding

whether he had an opportunity to present all arguments he wished to present, the plaintiff responded in the affirmative.

Pursuant to the caselaw discussed above, the following considerations are among those considered by courts in determining whether a union acts discriminatorily, arbitrarily, or in bad faith in violation of its duty of fair representation:

(1) Did the union decline to prosecute a potentially meritorious grievance?
(2) Did the union fail to investigate the grievant's case?
(3) Did the union too easily credit the employer's version of events?
(4) Did the union fail to present critical (i.e., game-changing) evidence on the grievant's behalf?
(5) Did the union act in an unprecedented manner in handling a particular grievance?
(6) Did the union lie or misrepresent facts to the grievant?
(7) Did the union's course of action benefit fewer of its members than it helped?
(8) Did the union representative spend time talking to the grievant about his or her case?
(9) Did the union representative spend time investigating the grievant's case?
(10) Did the union representative present arguments and evidence that are favorable to the grievant?
(11) Was the grievant afforded an opportunity at the grievance proceedings to tell his or her side of the story and present arguments on his/her own behalf?
(12) Did the grievance panel reach its ultimate conclusion after hearing both sides of the story?
(13) Was the grievant's position on a particular matter during the grievance proceedings contrary to his or her position on the same matter during the federal court proceedings?

Applying these considerations to the present case and taking the facts in the light most favorable to Plaintiff, the non-moving party, the Court concludes, for the reasons explained below, that no reasonable jury could find that the union's actions in processing Plaintiff's grievance were discriminatory, arbitrary, or in bad faith.

Plaintiff first argues that Lowran breached his duty by going into the local level hearings "cold." The Court does not find the argument persuasive for three independently sufficient reasons. First, Lowran testified that he "always" goes into local level hearings cold. Lowran Dep. at 110-11 (Dkt. 69-19). Under Linton II, discussed above, one relevant factor in considering whether the union breaches its duty of fair representation is whether the challenged

conduct of the union is consistent with its usual practice or, rather, an unprecedented departure from usual practice.   Here, Plaintiff has not established that Lowran treated him any less favorably regarding his preparation level at this stage of the process than he would treat any other grievant.

Second, the record in this case reflects that, although Lowran does not usually prepare for local level hearings, he actually did some preparation in Plaintiff's case, thus treating Plaintiff more favorably than he would others.   <u>See</u> Lowran Dep. at 125-27 (Dkt. 69-19) (discussing Lowran's pre-local level hearing communications with Plaintiff and UPS/union officials, where Lowran asked questions of Plaintiff regarding the circumstances of his discharge, told UPS officials that their position was wrong, and attempted to negotiate Plaintiff's reinstatement by giving specific reasons as to why Plaintiff's termination was improper under the CBA); Pl. Dep. at 377-79, 382-83 (Dkt. 69-8) (discussing Plaintiff's pre-local level hearing contact with Lowran, including a phone discussion in which Lowran told Plaintiff that he would try to find out from UPS "what's going on," and a meeting with Lowran and other union officials on the morning of the second day of the local level hearings during which Plaintiff and Lowran reviewed documents furnished by UPS).   Even Schmidbauer, the individual who made the decision to terminate Plaintiff, testified that Lowran advocated on Plaintiff's behalf during the local level proceedings:

> Q:    During the local level hearing concerning Mr. Moore's grievance . . . did Mr. Lowran attempt to negotiate with you any sort of resolution that would allow Mr. Moore to keep his job?
>
> A:    I remember Mr. Lowran attempting to get me to change my mind and get him – and allow him to come back to work, yes.
>
> Q:    What did Mr. Lowran state to you in that regard?

A:    I don't recall exactly what.  I do recall him asking for consideration, giving him an opportunity to come back to work.

Q:    Did he ask you to reduce the discharge to a suspension?

A:    I really don't remember the specifics of it.  I know that he definitely wanted to get Mr. Moore back to work.

Schmidbauer Dep. at 136-37 (Dkt. 88-5).  In addition, the record reflects that Lowran requested a one-day continuance of the local level proceedings so that he could review papers that he had just received from UPS.  Lowran Dep. at 138-139.  These efforts by Lowran, all taking place both before and during the local level proceedings, are not insubstantial, and they do not constitute a breach of the union's duty of fair representation under the caselaw discussed above.  Although Plaintiff stated in his declaration that "Lowran did not interview me or otherwise investigate the discharge before the Local Level hearing," Pl. Decl. ¶ 123, Plaintiff admits in his deposition, cited above, that he and Lowran communicated prior to, and during, the local level hearing about his termination, and the above-cited portions of the record adequately demonstrate that Lowran's conduct at the local level did not fall anywhere near the level of arbitrary or perfunctory.

Third, and in any event, even if Lowran was inadequately prepared for the proceedings at the local level – and there is no evidence of inadequate preparation on this record – Plaintiff cannot establish prejudice, a necessary element of his claim against the union, as Plaintiff's case was not lost at the local level.  See Dushaw, 66 F.3d at 132; Black, 15 F.3d at 585.

Related to Plaintiff's argument that Lowran did not adequately prepare for the local level hearing, to the extent Plaintiff still wishes to pursue an argument that Lowran breached the duty of fair representation by "fast-tracking" Plaintiff's grievance at the local level by scheduling the hearing too soon after Plaintiff was terminated, the argument is meritless.  This is because, again,

Plaintiff cannot show prejudice and, in any event, the record reflects that Lowran adequately investigated and prepared for the proceedings at the local level, despite his custom otherwise.

Plaintiff further argues that the union acted arbitrarily by accepting as true UPS's position that Plaintiff committed methods infractions that were deserving of some form of discipline. This argument is perplexing, given Plaintiff's own admission, made before the State Panel, that he committed methods infractions:

> Q:    Darwin, I got to ask you, . . . it sounded like you'd acknowledge the fact that you might have done some things wrong, would you say that's a fair assessment?
>
> A:    Did        I        do        some        things        wrong?
>
> Q:    Yes. . . .
>
> A:    I was trying to correct the actions.  I was – did I make mistakes out there with methods?  I did, yes.  You know, yes, there were mistakes.  They weren't intentional, but yes, there were mistakes.

Hr'g Tr. at 314-15 (Dkt. 69-25).  Plaintiff apparently would have the union assert an argument that is inconsistent with what he – on his own behalf – told the panel.[16]  Suffice it to say, Plaintiff would probably have a better argument that the union acted arbitrarily had it actually advanced the argument that Plaintiff now contends it should have advanced.[17]   In any event, because Plaintiff expressly admitted during the State Panel proceeding that he committed methods infractions, he cannot now turn around and argue to this Court that the union acted arbitrarily by failing to assert a contrary argument.  See Dushaw, 66 F.3d at 133.

---

[16] In his declaration, Plaintiff is adamant that he did not violate any UPS methods during his lock-in rides, except where otherwise directed by Romps; yet, Plaintiff told the State Panel the exact opposite.

[17] In Schoonover, a case on which Plaintiff relies (discussed above), the union credited the employer's version of the events with no investigation.  The same is not true here, where Plaintiff admitted to the State Panel that he committed methods infractions.

Next, Plaintiff argues that the union breached its duty of fair representation when Lowran failed to object to UPS's repeated references during the State Panel proceedings to Plaintiff's past methods violations. However, Lowran testified that "[n]othing in the [parties' CBA] states that evidence of undocumented infractions may not be used at the State Panel" and that "[t]he State Panel would not have prevented use of such evidence." Lowran Decl. ¶ 3 (Dkt. 100-1). Plaintiff offers no evidence rebutting Lowran's testimony. Therefore, Plaintiff's argument that the union breached its duty by failing to make a meritorious objection is unpersuasive, because Plaintiff has not shown that the objection would have been meritorious.

Plaintiff further argues that Lowran failed to produce records that would have shown that employees committing violations similar to those committed by Plaintiff were disciplined under a CBA rule calling for progressive discipline and not termination. However, by Plaintiff's own admission, Lowran presented to the State Panel during the union's rebuttal case several examples of employees who were progressively disciplined and not immediately terminated. Pl. Dep. at 430-31. The Court's review of the transcript of the State Panel hearing confirms that Lowran did, in fact, spend a substantial amount of time making this argument during the proceedings, and did so in a clear and effective manner. See Hr'g Tr. at 253-261.

Plaintiff also argues that the union breached its duty of fair representation because Lowran failed to assert a meritorious argument during the State Panel proceedings, namely, the argument that Plaintiff should have been progressively disciplined, if disciplined at all, and not immediately terminated. This argument is entirely without merit on this record for a number of reasons. First, even if it were true that Lowran failed to advance the argument, Plaintiff told the panel that all information was presented on his behalf, precluding his contrary argument before this Court pursuant to Dushaw.

26

Second, Lowran did, in fact, argue before the State Panel that Plaintiff should have been progressively disciplined (i.e., that he should have received a warning) and not immediately terminated.  In fact, the argument was made by Lowran repeatedly.  See, e.g., Hr'g Tr. at 119 ("He should have been given a warning, but there was an agenda behind this."); 129-30 ("Darwin did not refuse.  Darwin did try his darndest to do everything the right way, even though he had to be told and reminded, that isn't unusual for drivers or anybody when you're telling them to do something, in trying to restrain them.  And we think that the Company did not prove their point of gross insubordination.  Darwin should not have been discharged under 17(I), and therefore, he should be returned back to work."); id. at 260-61 ("The Company uses 5C [the progressive discipline provision of the CBA] when they want to talk about disciplining somebody for not following directions."); id. at 261 ("So, in my opinion, the opinion of this Local, he should have been given a warning first.").  Plaintiff's position that the argument was not made is devoid of any factual basis and frivolous.

Third, Plaintiff was afforded opportunities throughout the State Panel proceedings to speak, and assert arguments, on his own behalf:

Q:     Did you make statements on your behalf [at] the state panel?

A:     Yes, I did.

Q:     You had an opportunity to speak up, right?

A:     Yes.

Q:     You had an opportunity to tell the panel what you thought; is that correct?

A:     Yes.

* * * *

Q:     Did you have an opportunity to tell the facts of whatever it is you thought was being misstated?

27

A:      Yes.

Pl. Dep. at 355.  Indeed, the hearing transcript reflects that Plaintiff spoke on his own behalf very frequently throughout the proceedings.  Under the caselaw in this circuit, that Plaintiff was afforded constant opportunities to speak on his own behalf at the grievance proceedings weighs strongly against a finding that the union breached its duty of fair representation in failing to present a certain argument.

Plaintiff also argues that Lowran failed to adequately prepare for the State Panel proceedings.  But the undisputed evidence in the record reveals the exact opposite:

- Between Plaintiff's local level hearing on June 4-5, 2009 and the State Panel hearing on June 17, 2009, Plaintiff asked Lowran for documents and information, which Lowran provided.  At Plaintiff's request, Lowran provided Plaintiff with copies of the documents the union had received from UPS, Lowran's notes from the local level hearing, and witness statements referenced by UPS at that hearing.  Pl. Dep. at 389, 394, 399, 402-03.

- Lowran and Plaintiff prepared an outline prior to the State Panel hearing on how the union would present Plaintiff's case before the State Panel.  Id. at 394, 411-12.

- Lowran elicited from UPS copies of its exhibits used during the local level hearing, and he and Plaintiff reviewed those documents.  Lowran Dep. at 134.

- Lowran met with Plaintiff two days before the State Panel hearing, after Lowran had conducted some witness interviews.  Id. at 135.

- Lowran met with Plaintiff on the morning of the State Panel hearing.  Id. at 135; Pl. Dep. at 417.

- During the lunch break on the day of the State Panel hearing, Lowran and Plaintiff met to discuss the proceedings, and re-work the Union's rebuttal case.  Pl. Dep. at 422-23.

These facts show – unequivocally – that Lowran's investigation and level of preparation for the State Panel proceedings was far from inadequate or perfunctory, whereas the opposite was true in Schoonover, a case on which Plaintiff relies.  In fact, the preparation and investigation done

28

by Lowran far exceeds the level of preparation and investigation of the business agent in <u>Jones</u>, a case on which Defendants rely, where the Eighth Circuit found no breach of the union's duty of fair representation.

Moreover, the Court has reviewed the entire transcript of the State Panel proceedings and concludes, as a matter of law, that, taking the evidence in the light most favorable to Plaintiff, and recognizing the fact that Lowran is not a lawyer and is not to be held to the standard of a licensed professional, <u>see</u> <u>Garrison</u>, 334 F.3d at 539, Lowran adequately and vigorously defended Plaintiff's interests during that proceeding, which lasted 9-10 hours.[18]  Review of the transcript further reveals that the union, UPS, and Plaintiff himself devoted a great deal of time and care to presenting their respective arguments to the panel.  Plaintiff and Lowran constantly worked together – harmoniously – as a team throughout the proceedings, presenting arguments with a reasonable level of clarity and effectiveness.  In addition, the sheer number of questions posed by the panel members throughout the proceedings – along with the depth and thoughtfulness of those questions – demonstrates beyond any doubt that the panel members took their factfinding responsibilities very seriously.  That the decision of the panel was reached under these circumstances is a factor that weighs very strongly against finding a breach of the union's duty of fair representation under the caselaw.

Despite this evidence, Plaintiff argues that the union breached its duty of fair representation by failing to present favorable evidence on his behalf.  Specifically, Plaintiff takes issue with the fact that Lowran did not accompany Plaintiff on his route, which Plaintiff argues extensively in his declaration would have allowed Lowran to gather evidence – other than Plaintiff's word – rebutting each methods violation with which Plaintiff was charged.  Pl. Decl.

---

[18] Plaintiff testified that his hearing before the State Panel was one of the longest State Panel hearings he has seen.  Pl. Dep. at 423.

29

¶¶ 124, 126-28.   Plaintiff also argues that Lowran failed to interview witnesses, such as Plaintiff's customers, who Plaintiff says would have offered valuable information supporting Plaintiff's position that he did not violate certain UPS methods with which Plaintiff was charged with violating.  Id. ¶ 125.

The Court rejects Plaintiff's argument for three independently sufficient reasons.  First, at the conclusion of the proceedings before the State Panel, Plaintiff was asked if all information was presented on his behalf, to which Plaintiff responded: "It would appear that all information has been presented on behalf of my case."  Hr'g Tr. at 317 (Dkt. 69-25).  Pursuant to Dushaw, discussed above, Plaintiff cannot successfully assert a breach of duty of fair representation claim premised on an assertion that the union failed to present favorable evidence on his behalf because he expressly told the panel the exact opposite.

Second, Plaintiff – who was very active in his own defense – does not argue that he ever asked or urged Lowran to present the kind of evidence that he is now arguing should have been presented.  In fact, review of the record reflects that Lowran did everything Plaintiff asked him to do in terms of the presentation of evidence at the State Panel.  Notably, Plaintiff has never asserted an argument that Lowran failed or refused to present any particular evidence to the State Panel despite a request that he do so.  Plaintiff's post hoc suggestion that certain evidence would have made a difference is not only speculative – thus failing to satisfy his "onerous" burden of showing prejudice, see Black, 15 F.3d at 585 – but also disregards (i) the Supreme Court's admonishment that a court's review of union action must be "highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities," O'Neill, 499 U.S. at 78, and (ii) Sixth Circuit law holding that

"miscalculation[s] in strategy" by the union are not actionable unless the strategy is "irrational."

Garrison, 334 F.3d at 541.

Third, in his declaration, Plaintiff makes much of the fact that Lowran did not ride Plaintiff's route, which Plaintiff asserts would have yielded evidence that he did not, in fact, commit many of the methods violations charged by UPS.   However, Plaintiff's declaration testimony faulting Lowran on that basis cannot be squared with his deposition testimony, in which Plaintiff testified that Lowran was already familiar with the route:

> Q:   Prior to the panel hearing on June 17th had you asked Lowran to do anything else that he hadn't yet done?
>
> A:   I'm not sure.  Seems like we recalled the route because we had driven the route in the past and, you know, verifying some of the accusations.
>
> Q:   Verifying some of?
>
> A:   The accusations that were made against me on how to disprove them and show the dishonesty, inaccuracies.
>
> Q:   Well, that's what you had gone through with him in the meetings you had with him, isn't it?
>
> A:   Well, we had talked about in the past how he had driven the route and there was stuff out there that just isn't accurate.
>
> Q:   And you had discussed that with him in your meetings, correct?
>
> A:   I believe we discussed it, yes.
>
> Q:   All right.  The company you knew had photographs, at least now they do, of all those different houses [where] they say you did the wrong thing, correct?
>
> A:   Correct.

Pl. Dep. at 413-15.  This testimony is fatal to Plaintiff's case for two reasons.   First, notwithstanding the litigation-induced position Plaintiff takes now, Plaintiff's testimony demonstrates that he himself did not deem it necessary for Lowran to ride the route at the time

Plaintiff and Lowran were preparing for the State Panel proceedings, as Plaintiff admits that Lowran had done so in the past and was familiar with it.  Second, Plaintiff's testimony demonstrates that the idea of Lowran running the route was discussed before the State Panel proceedings.  Plaintiff does not argue that he asked Lowran to run (or re-run) the route. Therefore, the decision not to do so was the result of a strategy that Plaintiff himself either explicitly or implicitly approved.  His position now – that Lowran's conduct in not running or re-running the route rose to the level of a breach of the union's duty of fair representation – is simply inconceivable on this record and arguably frivolous in light of the above-quoted deposition testimony.  In sum, the Court fully adopts the position of the union on this issue:

> Moore never claimed that more evidence (such as photos interviews, or route rides) was needed, until filing this lawsuit.  The record of this lengthy and contentious lawsuit contains not a shred of evidence bolstering the litigation-minted assertion that Lowran should have taken photos, ridden the route or interviewed customers.

Union Supp. Br. at 1-2 (Dkt. 124).

Plaintiff next argues that the union breached its duty of fair representation by allowing Lowran to continue serving as Plaintiff's representative despite the existence of political animus between Plaintiff and Lowran.  The Court rejects this as a basis for showing breach of the union's duty of fair representation because, first, the existence of political animus between a grievant and his or her union representative is not a new phenomenon in hybrid § 301 cases, and alone does not amount to a breach.  Jones and Dushaw, both discussed above, adequately illustrate that point, as the plaintiffs in both cases lost their respective hybrid § 301 cases despite the existence of palpable political animus between plaintiff and union representative.  In any event, Plaintiff has not demonstrated that any animus held against Plaintiff by Lowran in any way affected his representation of Plaintiff throughout the grievance proceedings.  For all the

reasons discussed above, the Court concludes, as a matter of law, that Lowran adequately represented Plaintiff in connection with the grievance proceedings following his June 1, 2009 discharge.

Moreover, the argument that any political animus held by Lowran against Plaintiff affected Lowran's representation of Plaintiff is severely undercut because, as Defendants correctly point out, Lowran successfully represented Plaintiff on four prior occasions – in 2004, June 2007, December 2007, and November 2008 – both before <u>and after</u> Plaintiff's status as a political dissident was well known within the union's political circle. <u>See</u> Am. Compl. ¶¶ 47-49, 57 (Dkt. 59) (alleging that Plaintiff's dissident status was first known in 2006 and fully recognized by 2007).

Finally, Plaintiff argues that the union evinced its purported bad faith toward him when it allegedly altered the audio recording of a May 28, 2009 grievance hearing involving Plaintiff, unrelated to the grievance at issue in this lawsuit. As alleged by Plaintiff in his declaration:

> 93. On Thursday, May 28, 2009, I attended a State Panel hearing in Grand Rapids on some of my grievances alleging disparate treatment. I recorded the May 28, 2009 State Panel proceeding without informing those present. Given my long battle to obtain information that the Company had voluntarily and routinely produced for years, and the disparate treatment directed towards me, I made my own recording of the hearing because I did not trust the parties or panel.

> * * * *

> 95. After a contentious and heated proceeding, the State Panel ordered UPS to produce the information that I had been struggling to obtain so that my disparate treatment grievances could be heard. This victory is recorded on my own recording, but is missing from the official recording. A segment of about 20 minutes is missing from the official audio recording and also from the official transcript of the official recording. I understand that my attorney will submit the official recording and my unofficial recording to the Court separately as Exhibits 37 and 38 respectively. I received the official recording shortly after September 18, 2009, when Greg Lowran provided it to me.

33

96. The segment deleted from the official recording, but included on my personal recording, included questioning of me by Union Chair George Sorenson about why I wanted the information from UPS. Also deleted from the official recording was an angry response by an obviously upset Chuck Schmidbauer, characterizing my claimed need for the information as "absurd." (See Moore Exh. 38 at Counter 1h38m30s through Counter 1h56m56s.) And finally, the Panel's ruling was itself deleted from the official recording – perhaps in light of the pendency of the ULP charge. Chairman George Sorenson directed UPS to share with me and the Union information that I had requested: "Case number 4340 is improper before this panel and case 4343 they're to be removed from the docket, go back and share your information and back to the sitting room."

97. In the place of the deleted segment on the official recording is a statement by an unidentified speaker that "Case number 4340 is improper before this panel; case number 4343 is improper before this panel." (Moore Exh. 38 Counter 1h49m49s).

Pl. Decl. ¶¶ 93-97 (Dkt. 109). However, Lowran, in his declaration, offers an innocent explanation, demonstrating that nothing improper was done by the union in connection with the audio recording of the May 28 grievance proceeding, and that there is nothing behind Plaintiff's conclusory allegations of deceptive and fraudulent conduct indicative of bad faith:

4. The State Panel on May 28 listened to part of the Union's presentation and then went into executive session during which the official recording device is turned off and the parties are excused from the room. During the executive session, the panel had certain questions about what information was sought and what had been produced. The parties (Union and UPS representatives, including Mr. Moore) were invited to return to the room so that panel members could ask their questions and discuss the requests. This type of invitation to return is a routine practice of the State panel when some issues are not clear or members have questions.

5. On May 28, the parties returned to the hearing room at the State panel's request. Moore and others then discussed the information requests with the panel members. The official recorder was not turned on during this discussion, but Moore's surreptitious recording continued. A transcript of that recording has been prepared by UPS and given to Moore's attorneys during this lawsuit.

6. After the discussion, the parties were again excused from the room. The Committee then reached a decision. The Committee Secretary read that decision into the official recording device. The Panel then went off the record again and the parties were later returned to the hearing room. Upon the parties' return to the hearing room, George Sorenson (the Chairman) summarized the decision in his

own words by saying: "Case number 4340 is improper before this panel and case 4343 they're to be removed from the docket, go back and share your information and back to the sitting room."  This is recorded at page 30 of the transcript of Moore's unofficial recording.

7.  After this statement, the hearing resumed and the official recording continued. Nothing was ever added to or deleted from the official recording.  The official recording was never altered in any way.  The meaning of the two phrasings of the decisions is identical.  The cases are "improper before the panel" because there is an NLRB charge pending about the information requests and the Panel wants the parties to attempt to work those issues out before any decision can be reached. Eventually, UPS did produce the information.

Lowran Decl. ¶¶ 4-7 (Dkt. 100-1).  Plaintiff submits no evidence rebutting the union's innocent explanation.[19]

## V.  CONCLUSION

For the reasons stated above, Plaintiff has failed to present a triable issue regarding his claim against the union for breach of its duty of fair representation.  The motions for summary judgment of the union (Dkt. 68) and UPS (Dkt. 69) are granted.

SO ORDERED.

Dated:  August 21, 2012                              s/Mark A. Goldsmith
      Flint, Michigan                              MARK A. GOLDSMITH
                                         United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 21, 2012.

                                         s/Deborah J. Goltz
                                         DEBORAH J. GOLTZ
                                         Case Manager

---

[19] In any event, even if Plaintiff had demonstrated a fact issue as to whether the union altered the recording as alleged (he has not), Plaintiff has not explained how such action allegedly taken by union in connection with a separate matter affected the proceedings at issue in this case, and has thus not met his burden to show prejudice.